# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### May 17, 2016 Session

## STATE OF TENNESSEE v. DOMINIQUE GREER

### Appeal from the Criminal Court for Hamilton County
### No. 277886   Rebecca J. Stern, Judge

_____

### No. E2015-00922-CCA-R3-CD – Filed May 17, 2017

_____

Defendant, Dominique Greer, was convicted of first degree felony murder and attempted especially aggravated robbery. He received a life sentence for felony murder and eight years for attempted especially aggravated robbery to be served concurrently to the sentence for felony murder. On appeal, Defendant argues: (1) the trial court erred by admitting evidence of a prior robbery; (2) the trial court erred by instructing the jury that it could consider the prior robbery for issues other than intent and identity; (3) the trial court erred by allowing Detective Merritt to testify concerning Defendant's cell phone records; (4) the trial court erred by overruling Defendant's motion to suppress; (5) the trial court erred by allowing a constructive amendment to the felony murder indictment; (6) the evidence was insufficient to support Defendant's felony murder conviction; and (7) there was cumulative error. Following our review, we reverse the judgments of the trial court because the trial court committed reversible error in its final charge to the jury.

### Tenn. R. App. P. 3 Appeal as of Right;
### Judgments of the Criminal Court Reversed and Remanded

THOMAS T. WOODALL, P.J., delivered the opinion of the Court, in which JAMES CURWOOD WITT, JR., J., joined. D. KELLY THOMAS, JR., J., filed a concurring opinion.

Jay Underwood, Chattanooga, Tennessee, (on appeal) and Daniel J. Ripper, Chattanooga, Tennessee, (at trial) for the appellant, Dominique Greer.

Herbert H. Slatery III, Attorney General and Reporter; Lacy Wilber, Senior Counsel; M. Neal Pinkston, District Attorney General; and Lance Pope and Kristen Spires, Assistant District Attorneys General, for the appellee, State of Tennessee.

# OPINION

*Background*

## 404(b) Hearing

Steve Carroll testified that he is an architect and partner at Rardin and Carroll Architects located on Preservation Drive in an industrial park. The business is located one block from Bonny Oaks Drive. Mr. Carroll testified that on July 21, 2010, at approximately 5:20 p.m. he was the last person to leave the business that day. As he was placing his laptop, briefcase, and other items in the back of his car, he heard someone say "give me your wallet and your cell phone." Mr. Carroll turned around and saw Defendant dressed entirely in black standing approximately five feet away with a gun pointed at Mr. Carroll. Mr. Carroll immediately pulled out his wallet and cell phone and placed them on the ground. He told Defendant, "you can have anything you want just please don't shoot me." The gun appeared to be a "silver aluminum colored automatic." Defendant picked up the items and asked Mr. Carroll if he had anything else. Mr. Carroll told him, "I've got my laptop, I've got my car, here are my keys if you want to take it, that's fine. Again, just don't shoot me." Defendant looked at him and said, "[Y]ou seem like a nice guy, I'm not going to hurt you." Defendant then ran off toward Jersey Pike. Mr. Carroll got into his car and drove to an adjacent office where he used the phone to dial 9-1-1.

Mr. Carroll later received his cell phone bill which reflected that three calls were made from his phone after the robbery; he did not recognize the numbers. Mr. Carroll's wallet and some of its contents were later recovered by the Hamilton County Sheriff's Office. On September 17, 2010, Mr. Carroll identified Defendant from a photograph lineup shown to him by a detective.

Detective Jeff Baker of the Hamilton County Sheriff's Department testified that on August 30, 2010, he searched a wooded area near Defendant's grandmother's apartment which was located on Bonny Oaks Drive, within a mile from where the robbery of Mr. Carroll occurred. He had received information that a gun used in the victim's homicide may be located inside a sock hidden behind the apartment complex. While looking for the weapon, Detective Baker found Mr. Carroll's wallet lying on the ground by one of the trees outside the complex. He also found two black t-shirts. On cross-examination, Detective Carroll testified that he had been told that Defendant lived in the apartment complex with his grandmother, Odessa Moon. Detective Carroll admitted that he did not know who put the wallet behind the complex.

**Trial**

On July 21, 2010, Charles Moore, the murder victim's father, was living on Shady Hollow Lane in Chattanooga with the victim and the victim's mother, and Mr. Moore's wife, Angela Moore. The victim, twenty-one-year-old Darrian Moore, was not home when Mr. Moore arrived home from his work at Tennessee Valley Authority that evening. Mr. Moore explained that the victim worked a part-time evening shift loading trucks for FedEx. The victim usually left the house at approximately 4:30 to 5:00 p.m. to go to work, and he normally arrived home between 10:00 and 11:00 p.m. Mr. Moore testified that the Wood family lived on Lone Hill Road. Mr. Moore could see the Wood's residence from his house, and their back yards were close to one another. He said that Frank Wood, who lived at the Lone Hill Road residence with his grandparents, and the victim knew each other, and Mr. Wood had been inside Mr. Moore's residence. Mr. Moore testified that he had no knowledge of Defendant ever being inside his house, and he had never seen the victim and Defendant together.

Mr. Moore testified that on the night of July 21, 2010, he was in the sunroom updating his computer when he saw the victim back into the driveway and park his white Impala. He said that it was not unusual for the victim to sit in his car after arriving home to listen to music or to talk on the phone to his friends. Mr. Moore testified that he heard a "pop" after the victim arrived home but he thought that the sound was of the victim throwing trash into the empty dumpster. He noted that the family's Rottweiler was also barking "in a vicious tone." Mr. Moore looked outside toward the dog's pen but did not see anything. At some point, the victim called the house, and Mrs. Moore answered the phone. The victim said "mamma" twice and hung up. Mrs. Moore walked downstairs and told Mr. Moore that she thought something was wrong because the victim "didn't sound right." Mrs. Moore had also attempted to call the victim back but he did not answer the phone. Mr. Moore testified that he assured Mrs. Moore that the victim was in the driveway and was "probably just talking on the phone and not switching over[.]" Mrs. Moore then walked out to the garage, raised the door, and "flipped the lights a couple of times," which was the victim's signal to come inside, but he did not do so. Mr. Moore testified that Mrs. Moore walked back inside the house and told him that the victim's car was still running and that he would not answer the phone. Mr. Moore then ran outside to see what was going on. He found the victim in the passenger seat of the car with a gunshot wound to his left temple. Mr. Moore noted that he had never seen Defendant sitting in the passenger seat when parked in the driveway listening to music. Mr. Moore instructed Mrs. Moore to go inside and dial 9-1-1, and he got into the car and drove the victim to Memorial Hospital. The victim was later transferred to Erlanger Hospital where he died.

Mr. Moore testified that the victim was paid weekly by direct deposit from FedEx, and the victim had an ATM card to his checking account. Mr. Moore also had access to the checking account. He helped the victim save some money by leaving enough money in the victim's checking account to cover his bills and "$50 for him to waste." Mr. Moore transferred the rest to the victim's savings account. The victim did not have access to the savings account because Mr. Moore did not want the victim to "spree" spend it. He thought that the victim had approximately $1100 to $1200 in the account at the time of his death.

On cross-examination, Mr. Moore testified that the victim thought he and Wood were friends. However, he said that the victim and Wood had a falling out after they were pulled over by police "on Fraizer Avenue during Riverbend." The incident happened sometime in June of 2010.

Dwight Turner testified that in July of 2010, he was seventeen years old and lived at Lakeshore Manor with his father and step-mother. He knew Frank Wood and Defendant who was also known as "Head." Mr. Turner testified that he was familiar with the victim, and he had been at the victim's home "[o]ne particular time." He said that at some point in July of 2010, he was part of a conversation with Defendant and Mr. Wood about robbing the victim. The conversation took place in the "front of [Defendant's] yard." Mr. Turner testified there was talk about the "need to come up with $1500" for a "mix tape" for Defendant's brother "Boochie." Mr. Turner testified that it was Mr. Wood's idea to rob the victim because Mr. Wood knew that the victim worked and that the victim was saving his money. Mr. Turner said, "I believe that he showed Franklin his bank statements or, you know, receipts or something showing that he had money in the bank." Concerning the robbery, Mr. Turner testified:

> At first [Defendant] suggested that, you know, with me being kind of stocky wise and or whatever he suggested that I [hold] the weapon to him, you know, while he was at his driveway, demanding him get out of the car, move over, to be placed in the back seat with something covering him so that he couldn't see anything, and drive to the bank and get him to tell the code to the ATM to withdraw the money out of the bank.

It was Mr. Turner's understanding that the victim had approximately $3,000 in the bank. He said that because the victim knew Mr. Wood and his voice, Wood planned to "be in the back seat or in the front, wherever that he was going to sit, he didn't want to be seen or heard, his voice heard." Because Mr. Turner did not "want to do none of it, Defendant said that he would hold the weapon during the robbery and that "he would just pretty much have him at gunpoint with fear for his life so he wouldn't see what was

- 4 -

going on or do anything." Mr. Turner testified that after the robbery, the plan was to drop Defendant off and drive the car to a chop shop in Atlanta, Georgia. Mr. Turner testified that the robbery was originally supposed to take place the Friday before the murder occurred on Wednesday, July 21, 2010. Mr. Turner testified that he had planned to buy school clothes with his share of the proceeds from the robbery. He said that Defendant planned to use his share to help his brother produce the mix tape. Mr. Turner did not know what Mr. Wood planned to do with his money, even though Mr. Turner testified about having a conversation with Mr. Wood in which Mr. Wood talked about what he wanted to do with the proceeds.

Mr. Turner testified that he left his father's house due to a disagreement and was staying with Edward "EJ" King. Mr. King's house and Defendant's mother's residence were in the same neighborhood. Mr. King also lived one neighborhood over from the victim's house and Mr. Wood's house. Mr. Turner testified that while at Mr. King's house, Mr. Turner and Wood had another conversation about the robbery. He said that Mr. King's cousin, Mr. King, "Cornelius," Angel Kilgore, and another female were also at the house at the time. Mr. Turner testified that he and Mr. Wood had been drinking, and he thought that Mr. Wood was drunk. He said that Mr. Wood was talking about what he wanted to do with the proceeds from the robbery, and Mr. Turner indicated that he wanted to buy school clothes. Mr. Turner did not like Mr. Wood discussing the robbery in front of others, and he eventually said, "I'm not doing it, brother." Mr. Turner testified that he told Mr. Wood that he "feared" Mr. Wood and the victim would become friends again, and Mr. Wood would "snitch" on them, which made Mr. Wood mad because the others were listening. Mr. Wood eventually calmed down, and he and Mr. Turner apologized to each other. Mr. Turner testified that he told Mr. Wood that he did not want him to participate in the robbery. However, Mr. Turner said that he could not talk to Defendant because Defendant "pretty much had his mind made up."

Mr. Turner testified that thirty to forty-five minutes later, Defendant arrived at Mr. King's residence in a car with a few other men. Defendant was not driving the vehicle. Mr. Turner testified that Defendant got out of the car and said that he had been trying to call Wood all day. Defendant also indicated that he wanted to rob the victim that night. Mr. Turner testified that Mr. Wood told Defendant that he could not go with Defendant because Wood had to go home because of his curfew. Mr. Turner said that he told Defendant that he was too intoxicated to go with Defendant. He did not see Defendant with a gun at the time. Mr. Turner testified that Defendant left, and Mr. Wood asked Mr. Turner to walk home with him. They saw Defendant at someone else's house as they walked up the hill. Mr. Turner testified that Defendant said, "[S]ee I told y'all I got a plan, brother, I told you." Mr. Turner testified that he left Mr. Wood at "Kailey's" house, and she and "Tracy" were going to drive Mr. Wood home. Mr. Turner then walked back to Mr. King's house and spent the night.

Mr. Turner testified that he spoke with Mr. Wood the following day at approximately 12:30 to 1:00 p.m. because Mr. Wood had left his iPod at Mr. King's house. Mr. Wood picked up the iPod, and Mr. Turner asked Mr. Wood about the robbery. Mr. Wood said he did not do it because he had curfew, and his grandmother was upset because he was drunk. Defendant later called Mr. Turner and told him he thought that he had murdered the victim. Defendant said that the victim began "tussling" with him and the gun "went off." Mr. Turner then talked to Mr. Wood, who said that the victim was sitting in the driveway with the car still running. The following day, Mr. Turner saw Defendant riding his bicycle. Mr. Turner testified:

> Like, well, I left the neighborhood to where the murder occurred. And he was, like, bro, I was like bro, you need to go home, bro. You know what I'm saying, it's taped up. He like, brother, I think I murdered him, but I didn't mean to, though, brother. And he proceeded to say that, you know, he didn't trust nobody no more. He was like anybody who say something, brother, I got somebody who will take them off the map. Which that's saying that he would kill them. No witnesses, no nothing.

After the murder, Mr. Wood asked Mr. Turner to tell police that Mr. Wood had given him some clothing. Mr. Wood also wanted Mr. Turner to be his alibi and tell police that they met on the rock road by Mr. Wood's house at approximately 9:30 to 10:00 p.m. to exchange tennis shoes and a t-shirt. Mr. Turner told Mr. Wood that he did not want to get involved.

On July 22, 2010, Mr. Turner spoke with Detective Gienapp from the Hamilton County Sheriff's Department and gave a statement. Mr. Turner admitted that he lied to Detective Gienapp in the statement because Mr. Turner was in "fear of [his] life" and did not want to be involved. Mr. Turner gave a second statement to police on July 27, 2010, in the presence of Detective Van Hinton. Detective David Sowder, Mr. Turner's father, and Mr. Turner's Uncle, Sergeant Darrel Turner of the Hamilton County Sheriff's Department were also present during the statement. Mr. Turner testified that his father and uncle told him to tell the truth. He told the detectives the information as to who was to be involved in the robbery and how the proceeds would be split up.

Franklin Wood testified that he pled guilty to facilitation of especially aggravated robbery in the present case. He and the victim had been friends and they would hang out "mostly every day." Mr. Wood testified that in July of 2010, he lived on Lone Hill Road, and his backyard connected to the victim's backyard. He had been inside the victim's house and in his car. Mr. Wood testified that he and the victim went to Riverbend together in 2010 to watch the fireworks. At some point, they were pulled over, and the

police found "brown paper doggie [sic] bags and residue marijuana [sic] all over the car." After that, Mr. Wood and the victim did not hang out as much because Mr. Wood felt that the victim blamed him for what happened. Mr. Wood testified that he and the victim had an altercation when he got a phone charger back from the victim. He said that approximately two weeks after the fireworks display the victim also flipped him "the bird" from his driveway. Mr. Wood, who was standing on his balcony, lost his temper, walked over to the victim's house, and they had a fight. He did not speak to the victim again after the fight.

Mr. Wood testified that he and Defendant were both friends with Dwight Turner. He said that a year or more prior to the victim's murder, there was a conversation with Defendant about burglarizing the victim's house in order to steal guns. At the time, Mr. Turner was living at Lakeshore Manor. Mr. Wood testified that just prior to the victim's murder, Mr. Wood was at a gathering at Edward King's house with Mr. Turner, Mr. King, Ms. Kilgore and her friend, two of Mr. King's cousins, and one of Mr. Turner's friends. Mr. Wood testified that he and Mr. Turner were drinking, and Mr. Wood was drunk. At some point, Mr. Wood was in the kitchen with Mr. Turner, Mr. King, Ms. Kilgore, and her friend when Mr. Turner said that if something happened to the victim, Mr. Wood would be a "snitch." Mr. Wood testified that he knew there was a plan to rob the victim and that Defendant and Mr. Turner were involved. Mr. Wood said that he did not have a role in the robbery that was supposed to occur that day. He testified that there was a discussion about taking guns but he did not hear anything about taking money or going to the victim's bank.

Mr. Wood testified that Defendant arrived at Mr. King's house at approximately 9:00 p.m. with some friends. He said that Defendant had a gun resting on his lap, and Mr. Wood did not get into the car with Defendant and the others because Mr. Wood had to be in for curfew in an hour. Mr. Wood testified that when Defendant told Mr. Turner to get into the car, Mr. Turner began crying and said that he did not want to get in trouble. Mr. Wood testified that when Defendant saw Mr. Turner "crying and acting crazy he took off." Mr. Wood got a ride home, and Mr. Turner spent the night at Mr. King's house.

Mr. Wood testified that on the day of the murder Defendant texted him and said that he needed some shoes and a shirt. Mr. Wood then called Defendant who said that he had robbed someone on "58." The State introduced Mr. Wood's cell phone records from July 21, 2010. Mr. Wood acknowledged that he sent Defendant a text message at 9:03 p.m. telling Defendant to stop by his house before 9:30 because his probation officer would be calling at 9:45 p.m. At approximately 9:13 p.m., Defendant texted that he was near "Booker T." and he asked if Mr. Wood had the shoes. Mr. Wood met Defendant at the bottom of the hill near Mr. Wood's house. Defendant said that he had robbed a "white guy on 58 at the liquor store." Defendant also said that during the robbery, the victim

said that he had "kids and everything." Mr. Wood testified that Defendant "flashed the money that he took from the guy," and Mr. Wood saw that Defendant had a gun. Mr. Wood also noted that Defendant was barefoot, and he was wearing a black t-shirt with a Superman emblem on it.

Mr. Wood testified that he and Defendant walked to the corner of the street where the victim lived, and Defendant asked, "[W]here your boy at[?]." They both looked toward the victim's house and saw that the victim was not at home. Mr. Wood testified that he told Defendant that it was time for Mr. Wood to be home for curfew, and he left. He noted that he left Defendant standing in his next door neighbor's yard. He said, "All of our yards, my house and [the victim's] house and my next door neighbor's, all three of our back yards intersect." Mr. Wood testified that he knew what Defendant planned to do because Defendant "had a gun and he robbed somebody before and I knew I guess when he was over there that he was going to do it." Mr. Wood said that he walked back home and did not call police because he was only worried about himself. Mr. Wood testified that he later missed three calls from Defendant while Mr. Wood was eating dinner with his family. He called Defendant back at approximately 10:00 p.m., and Defendant asked if the police were there. Mr. Wood told him no and asked why. Defendant said, "[Y]ou ain't seen from me, you ain't heard from me. And he just hung up."

Mr. Wood gave statements to law enforcement on July 22 and July 23, 2010. He did not mention Defendant's name during either of the statements because he was "just afraid of the whole situation." Mr. Wood told them that he met Mr. Turner to give him some shoes because that is what Mr. Turner told him to say. He said that he never met Mr. Turner to give him any shoes and that he gave the shoes to Defendant. Mr. Wood admitted that he told detectives that he did not know anything about the murder. Mr. Wood and Defendant were later arrested on July 29, 2010. Both were juveniles at the time. Mr. Wood testified that the following day while in juvenile court, Defendant told him that the victim was "bucking the whole time and he knew [the victim] knew who he was and [the victim] tried to go for the keys and his head hit the gun and it went off." Mr. Wood then told his attorney what Defendant told him. Mr. Wood testified that he did not shoot the victim or accompany Defendant to the victim's house on the night of the robbery. He also said that he did not give any information to Defendant about the victim's bank accounts or where he banked.

However, during a recorded call on July 27, 2010, Mr. Wood told Mr. Turner that he did not set up a "murder." He did not know that the call was being recorded. He also told Mr. Turner that he told Defendant where the bank was at and that it was the one by the mall and that Defendant planned to "sit out there until [the victim] got off." Mr. Wood then told Mr. Turner, "[Y]ou need to come to my aid, we need to tell[.]" Mr.

Wood testified that he knew that Defendant was going to rob the victim when he left Defendant standing near the victim's house, because Defendant had a gun, and he robbed somebody before.

On cross-examination, Mr. Wood acknowledged that he was required to testify as part of his plea agreement. He admitted that he lied in the first statement to police when he denied any knowledge of the plan to rob the victim. He was indicted on October 13, 2010, and he hired an attorney early in 2011 and received the State's discovery materials. Mr. Wood admitted that in November of 2012, he gave his first statement that was consistent with the State's allegations. In the statement, Mr. Wood stated that Mr. Turner brought up the idea of robbing the victim. Mr. Wood described seeing Defendant at the party with a black revolver with a brown handle. He said that on the day of the murder he saw Defendant with a chrome gun. In his November 2012 statement and at trial, Mr. Wood said that he thought that the chrome gun was a semiautomatic.

Angel Kilgore testified that she knew Franklin Wood from Central High School. She also knew Dwight Turner and Edward King. She knew the victim through mutual friends. Prior to the victim's murder, Ms. Kilgore was at Mr. King's house with Mr. King, "Redee," Mr. Turner, Eric Traylor, Mr. Wood, and Quinisha McCurdy. Ms. Kilgore testified that Mr. Turner was drunk, and others were drinking and smoking marijuana. At some point during the evening, Ms. Kilgore heard Mr. Wood and Mr. Turner discussing a robbery. She testified:

> We were all sitting in the kitchen. And there were a couple of conversations going on. And there was one conversation where the only thing that I heard was Mon, and that was because a while back when [we] were in school Mon and EJ had gotten into it over something and they were talking about that. And that was the only name I heard. And they was talking - - it was like how it began they were talking about getting new school clothes.
>
> *     *     *
>
> And they said that they were going to rob somebody. And that's how they were going to get their new school clothes. And they said that they didn't want to - - they wasn't going to kill him or anything. They was just going to try to hurt him, and take the gun and that was just to scare him. They said that they was just going to hit him with the gun. And then they - - Frank was talking about the time that he thought he got off and everything, and they were talking about what they were going to wear.

　　　　*　　　*　　　*

　　　They said that they were going to dress up in all black so they didn't - - so he wouldn't know who it was. And then they said they may just put a bag over his head and make him go to the bank. And then Frank, well, he started to get scared. So Dwight told him that he think that - - he thought that he would snitch.

　　　Ms. Kilgore testified that Mr. Wood thought "that was messed up because he told them that he wouldn't be the snitch." She said that they were later sitting in the den and either Mr. Wood's or Mr. Turner's cell phone went dead while they were trying to text Defendant. Ms. Kilgore testified that everyone went outside when Mr. King's mother got home. While they were outside, Defendant arrived in a car with Tracy Turner and "Smiley." Defendant was sitting on the passenger side. Ms. Kilgore testified that Defendant was holding a gun in his lap, and he put it away when she walked up to the car. She said that Defendant and Tracy Turner were trying to get Dwight Turner to get into the car with them. Ms. Kilgore testified that Dwight Turner was begging them not to let him go because he was drunk and did not want to get into trouble. She said that Mr. Wood got into the car with her, Quanesha McCurdy, and Shamika McCurdy, and they dropped him off on a street near his house. Mr. Turner was supposed to spend the night at Mr. King's house.

　　　On cross-examination, Ms. Kilgore testified that the gun she saw in Defendant's lap was a small black gun.

　　　Sabretta Linder testified that Defendant's brother, Kevin "Boochie" Greer, is the father of one of her children. Odessa Moon is Defendant and Mr. Greer's grandmother. In July of 2010, she was living "[i]n the west side." Ms. Linder testified that she knew Mahara Taylor and Edward King. She recalled giving a statement to Detective Van Hinton in August of 2010. She did not recall telling Detective Hinton that Defendant told her that he was involved in the victim's murder. Ms. Linder only remembered that the detective told her that Defendant had something to do with the murder. She also did not recall telling Detective Hinton that Defendant told her that Jamicah Moore drove the car.

　　　The prosecutor presented a transcript of a taped interview of Ms. Linder with Detective Hinton. The prosecutor attempted to impeach Ms. Linder with her prior inconsistent statements that Defendant told her he was involved in the victim's murder and that Defendant told her ATL (the street name for Jamicah Moore) was the driver of the car that transported Defendant to and from the area of the crime. Ms. Linder admitted that the transcript of her statement reflected that she made those statements, but she did

- 10 -

not remember saying those things. Defense counsel made an objection to Ms. Linder's testimony as to who drove the vehicle because Ms. Linder just heard it "on the street." However, the prosecutor read Detective Hinton's question to her about who told her, and she stated Defendant's name. Defense counsel did not object to the entire transcript of Ms. Linder's statement to Detective Hinton being hearsay, and therefore strictly admissible solely for impeachment purposes.

Without an objection to the prosecutor reading out loud in the jury's presence specific questions to and responses by Ms. Linder, the prosecutor elicited the following:

Q.              Ms. Linder, did [Defendant] ever tell you that he was involved in the death of [the victim]?

[Ms. Linder]:   No.

*     *     *

Q.              So [Defendant] told you that he had something to do with it.

[Ms. Linder]:   That's what it's saying, but I don't recall telling them that. I recall them telling me.

Q.              You agree that's what this transcript says.

[Ms. Linder]:   Uh-huh.

*     *     *

Q.              All right. Did [Defendant] at any point in time tell you who the driver of the vehicle was?

[Ms. Linder]:   No.

Q.              He did not?

[Ms. Linder]:   No.

*     *     *

Q.              Who told you [Jamicah Moore] was driving. [Detective] Hinton asked you that question; is that correct?

- 11 -

| | |
|---|---|
| [Ms. Linder]: | Yes. |
| Q. | Are you Linder [in the transcript]? |
| [Ms. Linder]: | Uh-huh |
| Q. | What's your response? |
| [Ms. Linder]: | [Defendant]. |
| Q. | So in August of 2010 you hear directly from [Defendant] that Jamicah [Moore] was to be the driver of the car; is that right? |
| [Ms. Linder]: | That's what it's saying. But I don't remember. |

Since Defendant did not object to the transcript of Ms. Linder's evidence being hearsay, and thus limited to its use as impeaching evidence, the portions of Ms. Linder's statement were admitted as substantive evidence of the truth of the matters asserted in the statement. *State v. Smith*, 24 S.W.3d 274, 280 (Tenn. 2000).

Ms. Linder testified that while Defendant was in custody, he asked her to look for a gun that he referred to as his "bitch." She said that the gun was registered to Kevin Greer, and she thought it was a silver .38 [sic] caliber. He told her that the weapon was supposed to be wrapped in a dark-colored sock at his "nanny's house" near a bottle in the bushes outside of the house. Ms. Linder looked for the gun but did not find it. She called Defendant and told him that she could not find the gun. She later told Detective Hinton where the gun was supposed to be, and they went to look for it but did not find it.

During a recorded call from the jail played for the jury during Ms. Linder's testimony, Defendant told Ms. Linder to tell Jamicah Moore that he needed to stay away from the police. Defendant also told Ms. Linder to tell Jamicah Moore what to say if the police talked to him. Finally, in the recorded call from the jail, Defendant told Ms. Linder that ATL (Jamicah Moore) was Defendant's driver on the night of the victim's murder. Ms. Linder testified that Defendant also had her call Mr. King, which she did.

Mahara Taylor testified that he is a friend of Defendant. He did not recall ever seeing Defendant with a gun. However, during a recorded statement given to Detective Higdon on August 31, 2010, Mr. Taylor said that he had seen Defendant with a gun two months prior to the victim's murder. He described the weapon as a small, silver .380 caliber. Mr. Taylor did not recall telling the detective that Defendant referred to the gun

as his "bitch." He also described the gun as a revolver and not a semiautomatic. Mr. Taylor testified that his mother had a gun late in July to August of 2010. He thought that the weapon was a .380 or "something with a 38 in it." Mr. Taylor's mother took the gun to police to have it tested after the victim's murder.

Edward King testified that in July of 2010, he lived on Celtic Drive, and Defendant's mother lived up the hill from him on Northwind Drive. A few days prior to the victim's murder, Mr. King had several people at his house for a "little party" including "Angel, Eric, Redarius, Angel's friend, and [Dwight Turner] and Frank [Wood]." There was alcohol and marijuana at the party. Mr. King heard Mr. Wood and Mr. Turner in the kitchen talking back and forth "saying like [Mr. Wood] wasn't going to rob nothing, and then he told [Mr. Turner] he wasn't going to rob nothing." Mr. King testified that his mother came home later and told everyone to get out of the house. He went outside and saw Defendant riding in a car traveling down the hill. Mr. King testified that he thought Mr. Wood went home, and Mr. Turner spent the night at Mr. King's house. He said that on the day of the murder, Mr. Turner was at his house during the day and that night, and neither he nor Mr. Turner went anywhere.

Mike Cox of the Hamilton County Sheriff's Department, Crime Scene Unit, responded to Memorial Hospital on July 21, 2010, to photograph the victim's car, and he called a wrecker service to have the vehicle towed to the sheriff's office for processing. Detective Cox later dusted the car for fingerprints, and he lifted a total of eight palm and finger prints from the vehicle. He took three swabs to test for gun residue, and he took DNA samples from the car. Detective Cox also collected a blue glove, personal belongings, and the steering wheel cover from the vehicle.

Detective Robin Langford is a crime scene investigator for the Hamilton County Sheriff's Department. He processed the crime scene in the present case and found a spent .380 caliber shell casing in the driveway. Detective Langford testified that the casing was marked as a CCI brand and was the type typically used in a semiautomatic weapon. He also helped Detective Cox process the victim's car, and he said that buccal swabs were taken from Mr. Turner, Jamicah Moore, Mr. Wood, and Defendant.

Detective James Gienapp of the Hamilton County Sheriff's Department testified that he participated in executing a search warrant at Defendant's house on Northwind Drive. In Defendant's bedroom, Detective Gienapp collected a superman shirt, blue jeans, a rubber glove fragment from inside one of the jacket pockets, and a live .380 caliber round of ammunition. Detective Gienapp also collected three pairs of tennis shoes and a sock that appeared to have a blood stain. The live round of ammunition and the blood-stained sock came from a clothes hamper. Detective Gienapp testified that a

handwritten note was also found in Defendant's bedroom. From our review, the note appears to be an attempt at completing a timeline. The note states:

> Atl [Jamicah Moore] picked me up sometime after 9. I gave him 10 to come get me and run me to my neighborhood to get some shoes. Where Frank was supposed to meet us to give me some shoes[.] Yes I did tell him I was down the street but not from his neighborhood mine. Between one of those texts I called and asked him what size did he wear and he said 10 or 11 so I told him nevermind. . . .
> 9:45
> 10 or 15 mins. During that time I called ej and asked if he had some shoes and he said no. [T]hen Atl texted me and said call him and [he] asked me if I was staying or going back to my grandma's and I told him to come and get me then he called me when he was pulling up then took me to my grandma's around 10.

Detective Gienapp testified that he interviewed Mahara Taylor on August 3, 2010, and he also spoke with Mr. Taylor's mother. Mr. Taylor's mother was a bounty hunter, and she wanted to make certain that her weapon that she used in her job as a bounty hunter had not been used in the victim's murder so she brought the weapon in for examination. Detective Gienapp took fingerprints from Defendant and Mr. Wood. He also identified fingerprint cards from the victim, Jamicah Moore, and Charles Moore.

Detective Jeff Baker of the Hamilton County Sheriff's Department testified that he interviewed Defendant on July 24, 2010, and he spoke with Defendant's grandmother. Because he was 17 at the time, Defendant's mother was present during his interview. Defendant was arrested on July 28, 2010. Detective Baker testified that he participated in a search warrant at the home of Defendant's grandmother at the Laurel Ridge Apartments. Behind the apartment complex Detective Baker found two black t-shirts and a trifold wallet containing identification and a credit card. Inside the grandmother's apartment, he collected a dark blue long-sleeve shirt and a black glove. Detective Baker later spoke with the owner of the wallet, Steven Carroll. It was Detective Baker's understanding that Defendant stayed at the apartment with his grandmother when his mother was working.

Special Agent James Davis, II, is a forensic scientist with the Tennessee Bureau of Investigation (TBI) assigned to the microanalysis unit. He determined that a glove found on the seat of the victim's car had "gunshot primer residue" and that it came into contact or was near a recently fired weapon or recently fired ammunition components. Special Agent Davis also testified concerning two gunshot residue reports prepared by Special Agent Laura Hodge concerning the victim and Franklin Wood. He testified that the

gunshot residue tests on both of those individuals were negative. On cross-examination, Special Agent Davis testified that it was possible that the blue glove could have been left by emergency personnel who came into contact with the victim.

Special Agent Suzanne Lafferty of the TBI was assigned to the latent print unit at the time of the present offenses. She is an expert in latent print analysis. Special Agent Lafferty analyzed the prints from the crime scene and found four identifiable palm prints but no identifiable finger prints. She determined that the palm prints did not match that of the victim, Defendant, Jamicah Moore, Mr. Wood, or Charles Moore, the victim's father. On cross-examination, Special Agent Lafferty testified that she did not have prints from Dwight Turner to compare to the four palm prints. She checked the prints against the AFIS data base with no identifications.

Special Agent Kevin Warner of the TBI crime lab is assigned to the firearms identification unit as a firearms examiner. He is an expert in firearms analysis. Special Agent Warner received a bullet from the medical examiner's office that was recovered from the victim's head in this case. He determined that the bullet was a .380 auto caliber that could have been fired from "an AMT Backup or an IAI Backup." Special Agent Warner also received a shell casing which was a .380 auto caliber. The manufacturer of the shell casing was CCI, and it was a "NR" or "not reloadable" casing.

Special Agent Warner also received four firearms for comparison testing with the bullet recovered from the victim. He concluded that three of the weapons did not fire the bullet. Special Agent Warner was unable to determine if the fourth weapon, an "AMT or Back-up pistol" fired the submitted bullet. He said, "I determined that the class characteristics were the same. But there were no individual characteristics to link that gun as having fired that bullet." Special Agent Warner could not conclusively say whether the bullet was fired or not fired from the gun. He also received an unfired cartridge which he identified as a "CCI brand .380 auto caliber."

On cross-examination, Special Agent Warner testified that the bullet recovered from the victim's head was fired from a semi-automatic weapon and not a revolver. He also received a magazine from the crime scene containing seven unfired cartridges and other unfired cartridges from the crime scene. Special Agent Warner testified that the unfired cartridges "consisted of six Winchester brand .380 auto loaded with a full metal jacket bullet. And five Federal brand .380 auto loaded with a jacketed hollow point bullet." On redirect examination, Special Agent Warner noted that the magazine fit a Cobra FS380 pistol.

Special Agent Mike Turbeville of the TBI Crime Lab is the supervisor of the Forensic Biology Unit. Special Agent Bradley Everett is one of his employees, and he

performed DNA analysis on items sent to the lab in the present case. Special Agent Turbeville testified that Special Agent Everett received a blood sample from the victim and buccal swabs from Dwight Turner, Defendant, and Jamicah Moore. He also received a rubber glove with a reddish brown stain on the outside which was indicative of blood. The DNA on the outside of the glove, which was found outside the emergency room, matched that of the victim. The swabs from the inside of the glove yielded a limited DNA profile that could only be used for exclusionary purposes. The following were excluded from DNA on the inside of the glove: the victim, Dwight Turner, Defendant, Jamicah Moore, and Franklin Wood.

Special Agent Turbeville testified that a rubber glove fragment recovered from Defendant's residence had a DNA profile that matched that of Defendant. A sock from Defendant's room had Defendant's blood on it. Two swabs taken from the steering wheel of the victim's car were presumptively positive for blood that matched the victim's DNA. There was no identifiable DNA found on the gear shift or the driver's side headrest of the victim's car. Special Agent Turbeville testified that clothing taken from Defendant's closet, including the Superman shirt, did not have the presence of blood on them.

Detective Ed Merritt of the Hamilton County Sheriff's Department testified that he interviewed Mr. Wood just after midnight on July 22, 2010. He had Mr. Wood's cell phone number, and he obtained the victim's and Defendant's cell phone numbers. Mr. Wood's cell phone provider was Verizon, and Detective Merritt received text and call detail reports for Mr. Wood's account. Detective Merritt testified that the victim's and Defendant's cell phone carrier was Cricket. He also obtained call and text reports for their accounts as well. The records that Detective Merritt received contained "cell site information on them." He noted that different cell phone providers have different cell towers. Some of them are shared with other providers. Detective Merritt testified that Cricket sent a "how-to- read" document with the call detail reports about how cell site information should be used. The language of the documents specifically stated that the records could not be used by themselves to show the locations of a caller or a handset. Detective Merritt acknowledged that a cellular signal "has the potential to jump around." He disagreed with the limitations that Cricket placed on what conclusions could be drawn from the cellular records.

Detective Merritt testified that he obtained a handset from the Cricket store to use for twenty-four hours. He then went to the Laurel Ridge Apartments and made a series of test calls from Defendant's grandmother's former apartment. Detective Merritt made calls from the bedroom, bathroom, kitchen, dining room area, living room, and one call from outside the residence by the balcony. All of the calls originated and terminated on tower 2014. None of the calls originated or terminated with tower 2031. Detective

Merritt acknowledged that the purpose of the cell phone towers was not to locate handsets but to "provide a quality communication experience for their customers." He also noted that there were variables that can affect the way a phone connects with a particular tower such as a load on the network, elevation, a "line of sight issue," or other obstructions.

Detective Merritt testified that the records he received from Cricket showed communication between Defendant's and Mr. Wood's cell phones. After an analysis of the communication between the two, Defendant and Mr. Wood were arrested on July 28, 2010. Detective Merritt testified that the victim made a phone call from his cell phone at 9:40 p.m., and it connected to cell phone tower 2031. A call back to the victim's phone also connected to tower 2031. Detective Merritt testified that from 9:13 p.m. to 9:47 p.m. all outgoing calls from Defendant's cell phone also connected to tower 2031. An incoming call from Jamicah Moore during that time showed Mr. Moore's handset was connected to tower 2014.

Detective David Sowder of the Hamilton County Sheriff's Department testified that he was the case agent assigned to the victim's murder in July 2010. He went to the crime scene first and then drove to Memorial Hospital and spoke with Charles Moore. He and Mr. Moore left Memorial Hospital and drove to Erlanger Hospital where the victim had been transported. Detective Sowder received Franklin Wood's name from Mr. Moore. Mr. Wood was interviewed by another detective, and based on information obtained from the interview, Dwight Turner was brought in for questioning. Mr. Turner provided some information, and Defendant was interviewed at some point. The decision was then made to arrest Defendant and Mr. Wood.

Detective Sowder testified that Mahara Taylor was also interviewed, and his mother provided a weapon to the sheriff's office for testing. He thought the weapon was a Cobra .380. The weapon was sent to the TBI for analysis and later released back to Mr. Taylor's mother. Detective Sowder testified that based on intercepted jail calls between Sabretta Linder and Defendant, Ms. Linder was interviewed. Based on the interview, they went to the Laurel Ridge Apartments. Detective Sowder testified that eleven .380 caliber rounds were obtained from Marvin Irvin, whose son is Jamal Irvin, an associate of Defendant. Detective Sowder testified that he sent three additional weapons to the TBI for testing that were collected after Defendant and Mr. Wood's arrest. He said that a Lorcin .380 was taken from Dwight Turner at the time of his arrest, and a Davis .380 caliber pistol was taken from an associate of Jamicah Moore at the time of the associate's arrest. Detective Sowder later learned that the TBI's "recommendation" was that an AMT weapon was used in the homicide. On September 18, 2012, an AMT weapon was recovered from the property room of the Chattanooga Police Department and sent to the TBI for testing.

Dr. Frank King, Jr., of the Hamilton County Medical Examiner's Office performed an autopsy on the victim. He determined that the victim died from a gunshot wound to the head, and the manner of death was homicide. Dr. King testified that the gun was six to twelve inches from the victim's head when it was fired. The bullet entered the victim's head from "left to right, slightly front to back, and upward as it went into the head."

Steve Carroll testified that he worked as an architect for Rardin and Carroll Architects located on Preservation Drive. At approximately 5:30 p.m. on July 21, 2010, Mr. Carroll left the office and walked to his car. As he was putting his briefcase and laptop in the vehicle, he heard someone say something. When Mr. Carroll turned around, he saw Defendant who said, "[G]ive me your wallet and your cell phone." He said that Defendant was dressed all in black, and he had a silver gun that appeared to be an automatic "because it did not have a barrel on it," and he was pointing the gun at Mr. Carroll. Mr. Carroll testified that he gave Defendant his cell phone and wallet, and he said, "[H]ey, anything you want, just don't shoot me."

Mr. Carroll testified that Defendant asked if he had anything else, and Mr. Carroll told Defendant that he could take Mr. Carroll's laptop or briefcase. Mr. Carroll said, "Just don't shoot me." He testified that Defendant looked at him and said, "[Y]ou look like a nice guy, I'm not going to hurt you." Defendant then ran away toward Jersey Pike. According to Mr. Carroll's cell phone records, his phone was used to make a call at 7:31 p.m. to XXX-XXX-7718. Calls were also made at 7:37 and 7:38 p.m. to XXX-XXX-4064, which was a number assigned to Bessie Moore and used by Jamicah Moore. The phone was not in Mr. Carroll's possession when the three calls were made. In September of 2010, Mr. Carroll identified Defendant from a photographic lineup. Mr. Carroll's wallet and its contents were later recovered by police. On cross-examination, Mr. Carroll testified that there is a liquor store at the corner of Jersey Pike and Bonny Oaks, approximately 800 feet from where he was robbed. He thought that there was ten dollars in his wallet along with credit cards.

*Analysis*

## I.      Admission of Prior Bad Acts

Defendant contends that the trial court erred by allowing the State to introduce evidence that he robbed Mr. Carroll on the same day that he attempted to rob the victim. However, we find that the evidence was relevant to the issues of intent and identity and was properly admitted by the trial court.

- 18 -

As a general rule, "trial courts have broad discretion in determining the admissibility of evidence, and their rulings will not be reversed absent an abuse of that discretion." *State v. McLeod*, 937 S.W.2d 867, 871 (Tenn. 1996). The general rule is that evidence of a defendant's prior conduct is inadmissible, especially when previous crimes or acts are of the same character as the charged offense, because such evidence is irrelevant and "invites the finder of fact to infer guilt from propensity." *State v. Hallock*, 875 S.W.2d 285, 290 (Tenn. Crim. App. 1993). Tenn. Rule of Evid. 404(b) permits the admission of evidence of prior conduct if the evidence of other acts is relevant to a litigated issue such as identify, intent, or rebuttal of accident or mistake, and the probative value outweighs the danger of unfair prejudice. Tenn. R. Evid. 404(b) Advisory Comm'n Cmts.; *see State v. Parton*, 694 S.W. 2d 299, 303 (Tenn. 1985); *State v. Hooten*, 735 S.W.2d 823, 824 (Tenn. Crim. App. 1987). However, "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait." Tenn. R. Evid. 404(b). Before admitting evidence under Rule 404(b), the rule provides that (1) upon request, the court must hold a hearing outside the jury's presence; (2) the court must determine that the evidence is probative on a material issue and must, if requested, state on the record the material issue and the reasons for admitting or excluding the evidence; (3) the court must find proof of the other crime, wrong, or act to be clear and convincing; and (4) the court must exclude the evidence if the danger of unfair prejudice outweighs its probative value. Tenn. R. Evid. 404(b).

The rationale underlying Rule 404(b)'s exclusion of evidence of a defendant's prior bad acts is that admission of such evidence carries with it the inherent risk of the jury convicting the defendant of a crime based upon his bad character or propensity to commit a crime, rather than the conviction resting upon the strength of the evidence. *State v. Rickman*, 876 S.W.2d 824, 828 (Tenn. 1994). The risk is greater when the defendant's prior bad acts are similar to the crime for which the defendant is on trial. *Id*.; *see also State v. McCary*, 922 S.W.2d 511, 514 (Tenn. 1996).

In this case, the trial court properly conducted a pretrial hearing outside the presence of the jury. At the conclusion of the hearing, the trial court found:

> All right, I do believe that this evidence is probative on the issues of intent to some degree and definitely on identity because of the phone, [Defendant's] phone and the stolen phone calling the same number. And I find that the probative value outweighs the prejudicial effect, so I'm going to allow it.

We acknowledge that the trial court made no finding that proof of the other crime, wrong, or act was clear and convincing. Therefore, because the trial court failed to substantially comply with the requirements of the rule, its decision is entitled to no deference, and we

- 19 -

must conduct a de novo review. *State v. DuBose*, 953 S.W.2d 649, 652 (Tenn. 1997). In considering this review, we must consider the evidence presented at the pretrial hearing in determining the admissibility of the evidence under Rule 404(b). *Id*. at 653.

After conducting our de novo review, we conclude that the trial court properly determined that Mr. Carroll's testimony was admissible under Rule 404(b) to show Defendant's intent and the identity of Defendant as the perpetrator of the victim's homicide both of which were material issues in this case. There was also clear and convincing evidence of the robbery of Mr. Carroll by Defendant. In this case, the State had the burden of proving that Defendant was involved in an attempted aggravated robbery at the time of the victim's murder.

*Identity*

From the onset of the trial, Defendant's identity as the perpetrator of the victim's murder was a contested issue. Evidence of incriminating statements by Defendant was presented through the testimony of witnesses who were not law enforcement officers, and whose credibility was strongly attacked by defense counsel. One of those witnesses, Mr. Wood, was a co-defendant who received a favorable negotiated plea agreement in exchange for his testimony in Defendant's trial, and testimony about another witness, Mr. Turner, was that he was involved in the initial planning to rob the victim, but withdrew. Mr. Turner was never charged.

In his opening statement to the jury, defense counsel's theory of the case was that Defendant did not commit the murder. He argued in great detail that there was no physical evidence which would link Defendant to the murder: no murder weapon, no finger prints, no DNA, no clothing. Defense counsel further attacked the credibility of Mr. Turner and Mr. Wood, alluding that the proof would show that they had reasons to provide false testimony concerning Defendant's involvement. Defendant's theory of the case did not change during the course of the trial. In closing arguments to the jury, defense counsel stressed that no credible evidence showed that Defendant committed the murder. He argued that the proof established that Mr. Wood and/or Mr. Turner committed the murder, suggesting Mr. Wood had a falling out with the victim and therefore a motive to plan and execute the aggravated robbery which resulted in the victim's death. Defense counsel also argued that there were no fingerprints, DNA samples, or other physical evidence identifying Defendant as the perpetrator.

The proof of Defendant's aggravated robbery of Mr. Carroll approximately four hours before the victim's death involved proof of Defendant's identity as the perpetrator of the victim's murder. Defendant took Mr. Carroll's cell phone and wallet. The cell phone was used in two calls with Jamicah Moore's phone approximately two hours later.

Jamicah Moore, according to testimony, was Defendant's driver to and from the area of the murder. During a recorded call, Defendant had told Mr. Moore that he was "quiet" and not telling the police anything and that the police could not figure out how Defendant got from one location to another on the night of the murder. There was evidence admitted that Defendant had told Ms. Linder, while Defendant was in jail on the murder charge, where he had hidden the handgun near his grandmother's apartment. Ms. Linder showed law enforcement officers the location. Although no handgun was found, Mr. Carroll's wallet was located during the search for the handgun in the same area where Defendant told Ms. Linder he had hidden the gun. Thus, to prove Defendant's identity as the perpetrator of the victim's homicide, it was necessary to connect Defendant to Mr. Carroll's cell phone and his wallet, and this was done by explaining how Defendant, who was a stranger to Mr. Carroll (he had to identify Defendant as the robber by looking at a photographic line-up), came into possession of Mr. Carroll's cell phone and wallet.

*Intent*

Defendant's theory of defense also included the assertion that there was no proof of a robbery or even an attempt of a robbery by whoever was the perpetrator. The testimony of the victim's father included the fact the he found the victim in the passenger seat of the victim's car with a bullet wound to his head. The victim had driven to his home and parked in the driveway shortly before he was discovered to have been shot. The victim's father testified that the victim regularly stayed in his car for a while and listened to music or talked to friends after parking in the driveway. However, he further testified that he never knew of the victim sitting in the passenger seat of his car while sitting in the driveway. There was testimony that the plans for the robbery of the victim involved forcing him to get out of the driver's seat and ride with the perpetrator(s) to a bank and make the victim withdraw money from the ATM. This is consistent with evidence of the robbery's planning. There was testimony that Defendant had made statements to witnesses that the shooting of the gun was accidental, with no direct admissions by Defendant that he approached the victim with intent to rob him. Thus, proof of Defendant's aggravated robbery of Mr. Carroll just four hours prior to the victim's death became relevant and highly probative of Defendant's intent to commit robbery of the victim. Specifically, co-defendant Mr. Wood testified that he communicated with Defendant a short period of time prior to the victim's murder. Mr. Wood walked to a location near his home and the victim's home (both yards intersect with Mr. Wood's next door neighbor) and gave Defendant some shoes. Mr. Wood pointed out the victim's home to Defendant, but at the time the victim's car was not yet at home. Defendant referred to the victim as Mr. Wood's "boy," asking Mr. Wood where his boy was. Co-defendant Mr. Wood testified that he knew Defendant's intent was to carry out the plans to rob the victim. Defendant had informed Mr. Wood of his robbery of Mr. Carroll. The following testimony of Mr. Wood was elicited by the prosecutor:

Q. Did you know what [Defendant] was about to do when he asked you where was your boy?

A. Yes, sir.

Q. How did you know that?

A. Well, he had a gun and he robbed somebody before and I knew I guess when he was over there that he was going to do it.

There was no objection as to Mr. Wood's testimony being inadmissible opinion testimony of Defendant's intent to rob the victim, although Defendant had properly objected in general in the pretrial hearing to proof of the prior bad act.

This testimony by Mr. Wood is not merely propensity evidence that Defendant had committed one robbery and therefore must have committed the murder in the perpetration of a robbery of the victim. The testimony was by a co-defendant. There was proof that Defendant, Mr. Wood, and Mr. Turner had planned a robbery of the victim. Mr. Turner had apparently backed out of the criminal enterprise according to some testimony. Mr. Wood testified that he was unable to participate because of his curfew. Mr. Wood was with Defendant facilitating Defendant's confrontation with the victim. Mr. Wood's perception of Defendant's intentions was crucial evidence of Defendant's intent at the time Defendant came into contact with the victim. Evidence of Defendant's prior of aggravated robbery was more probative of Defendant's intent than it was prejudicial, especially since, in this case, the evidence was already extremely probative of Defendant's identity as the perpetrator, as discussed above.

Defendant is not entitled to relief on this issue.

## II.    Jury Instruction Concerning the Admission of 404(b) Evidence

Defendant argues that the trial court erred by instructing the jury that it could consider the admission of 404(b) evidence for issues other than intent and identity, specifically as part of a common scheme or plan or to prove his motive. We agree that the trial court erred and that it is reversible error.

Rule 404(b) of the Tennessee Rules of Evidence provides that: "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait. It may, however, be admissible for other purposes." Other purposes has been defined to include: (1) motive; (2) intent; (3)

guilty knowledge; (4) identity of the defendant; (5) absence of mistake or accident; (6) a common scheme or plan; (7) completion of the story; (8) opportunity; and (9) preparation. *Parton,* 694 S.W.2d at 302; *Bunch v. State,* 605 S.W.2d 227, 229 (Tenn.1980); *State v. Jones,* 15 S.W.3d 880, 894 (Tenn.Crim.App.1999). Our supreme court has defined "common scheme or plan" evidence as "(1) offenses that reveal a distinctive design or are so similar as to constitute 'signature' crimes; (2) offenses that are part of a larger, continuing plan or conspiracy; and (3) offenses that are all part of the same criminal transaction." *State v. Shirley,* 6 S.W.3d 243, 248 (Tenn. 1999); *State v. Moore,* 6 S.W.3d 235, 240 (Tenn.1999).

Rule 30 (b) of the Tennessee Rules of Criminal Procedure provides:

> After the court instructs the jury, the parties shall be given an opportunity to object-out of hearing of the jury- to the content of an instruction that was given or to the failure to give a requested instruction. Counsel's failure to object does not prejudice the right of a party to assign the basis of the objection as error in a motion for a new trial.

While Defendant in this case did not object to the trial court's final written jury instruction concerning the admission of 404(b) evidence at trial, the issue was properly raised in Defendant's amended motion for new trial. *See State v. Haynes*, 720 S.W.2d 76, 84-85 (Tenn. Crim. App. 1986).

In the final jury instructions in this case, the trial court gave the following instruction:

> Evidence of other bad acts. If from the proof you find that the defendant has committed one or more bad acts other than those for which he is on trial, you may not consider such evidence to prove his disposition to commit crimes such as those for which he is on trial. This evidence may only be considered by you for the limited purpose of determining whether it provides, (A), the defendant's identity, that is such evidence may be considered by you if it tends to establish the defendant's identity in the case at trial; or two, [*sic*] a scheme or plan that is such evidence may be considered by you if it tends to establish that the defendant engaged in a common scheme or plan for the commission of two or more crimes that were related to each other that proof of one tends to establish the other; or (C) motive that is such evidence may be considered by you if it tends to show a motive of the defendant for the commission of the offense presently charged, or (D) the defendant's intent. That is such evidence may be considered by you if it tends to establish that the

defendant actually intended to commit the crime with which he is presently charged. Such evidence of one or more other bad acts, if considered by you for any purpose, must not be considered for any purpose other than that specifically stated.

The trial court had already ruled in a pre-trial hearing that evidence of the prior robbery was admissible only for the purposes to prove the identity of Defendant as the perpetrator and Defendant's intent. However, the trial court instructed the jury that it could also consider the prior robbery to prove a common scheme or plan ("signature" crime) by Defendant in committing a totally unrelated robbery that was only similar because a gun was involved. The trial court told the jury the prior robbery could be used to prove Defendant's motive. There was no factual basis in the evidence to support use of the evidence of the prior robbery to prove these additional factors, and they essentially left the finder of fact to apply the evidence as proof of Defendant's propensity to commit robbery.

"In determining whether instructions are erroneous, this Court must review the charge in its entirety and read it as a whole. A charge should be considered prejudicially erroneous if it fails to fairly submit the legal issues or if it misleads the jury as to the applicable law." *State v. Hodges*, 944 S.W.2d 346, 352 (Tenn. 1997). The instruction given to the jurors in this case failed to fairly submit the legal issue and misled the jurors as to the applicable law. The instruction permitted the jury to consider the robbery of Mr. Carroll for purposes other than intent and identity. Accordingly, we reverse the Defendant's convictions for felony murder and attempted especially aggravated robbery and remand this case for a new trial.

## III. Testimony Concerning Defendant's Cellular Phone Records

Defendant contends that the trial court erred by admitting lay testimony by Detective Merritt about Defendant's cell phone records and cell towers because Detective Merritt was not a cell phone expert. Defendant further contends that Detective Merritt offered "quasi-expert testimony." The State counters that Detective Merritt's testimony did not require expert knowledge.

Lay witness testimony is set forth in Tenn. R. Evid. 701 which provides:

    (a)    Generally. If a witness is not testifying as an expert, the witness's testimony in the form of opinions or inferences is limited to those opinions or inferences which are:

(1) rationally based on the perception of the witness and

(2) helpful to a clear understanding of the witness's testimony or the determination of a fact in issue.

Tenn. R. Evid. 702 provides:

If scientific, technical, or other specialized knowledge will substantially assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise.

We find that Detective Merritt's testimony did not require specialized knowledge as contemplated by Tenn. R. Evid. 702, which governs expert testimony. Detective Merritt testified that he obtained cell phone records for Mr. Wood, Defendant, and the victim. Mr. Wood's cell phone provider was Verizon wireless, and Defendant and the victim's provider was Cricket. Detective Merritt testified that Cricket sent a "how-to-read" document with its call detail reports for Defendant and the victim. He testified in detail concerning the content of the "how-to-read" document. Detective Merritt testified that the language of the document specifically stated that the call records could not be used by themselves to show locations of a caller or of a handset. Detective Merritt acknowledged that the purpose of the cell phone towers was not to locate handsets but to "provide a quality communication experience for their customers." He also noted that there were variables that can affect the way a phone connects with a particular tower such as a load on the network, elevation, a "line of sight issue," or other obstructions. Detective Merritt noted that he disagreed with the limitations provided by Cricket about the value of the records with respect to location. He also testified that the cell records to a certain extent could show the approximate location of a handset but not a person. Detective Merritt testified that the records were "not as exact as GPS."

Detective Merritt testified that he borrowed a handset from the local Cricket store, and he went to the apartment at Laurel Ridge Apartments where Defendant's grandmother had lived at the time of the murder. Detective Merritt made calls from the bedroom, bathroom, kitchen, dining room area, living room, and one call from outside the residence by the balcony. All of the calls originated and terminated on tower 2014. None of the calls originated or terminated on tower 2031

Detective Merritt testified that the records he received from Cricket showed communication between Defendant's and Mr. Wood's cell phones. After an analysis of

- 25 -

the communication between the two, Defendant and Mr. Wood were arrested on July 28, 2010. Detective Merritt read the cell phone records and testified that the victim made a phone call from his cell phone at 9:40 p.m., and it connected to cell phone tower 2031. A call back to the victim's phone also connected to tower 2031. Detective Merritt testified that from 9:13 p.m. to 9:47 p.m. all outgoing calls from Defendant's cell phone also connected to tower 2031. An incoming call from Jamicah Moore during that time showed Mr. Moore's handset was connected to tower 2014. In his testimony, Detective Merritt referenced the cell phone tower map that had been created for him, and he acknowledged that there were a number of towers in the area that were not on the map. Detective Merritt specifically told the jury that the cell phone companies "would not under any circumstances say that the phone was in connection with a certain sector [of] that tower."

The gist of Detective Merritt's testimony was about which cell phone tower Defendant's phone and the victim's phone were connected to at a particular time. In *State v. Hayes*, No. M2008-02689-CCA-R3-CD, 2010 WL 5344882 (Tenn. Crim. App. Dec. 23, 2010) a panel of this court held that a detective could testify that he saw the locations of the cell phone towers listed on the cell phone records and plotted the locations on a map. The detective also inferred that "the defendant traveled near these towers." The detective explicitly stated that he was not an expert in how the cell phone towers worked. This court held: "We conclude that a layperson could plot the locations of the towers on a map and draw the same inferences; therefore, his testimony did not require specialized knowledge as contemplated by Tennessee Rules of Evidence 702, which governs expert testimony, and the trial court did not err by allowing the testimony." *Id.* at *2.

We find that the trial court properly admitted testimony by Detective Merritt concerning the cell phone towers. The State specifically stated that it was not offering Detective Merritt as an expert in cell phone records. Although Detective Merritt testified that he had several classes in cell phone technology and that some of his knowledge of cell phones came from his work as a police officer, we find that the testimony concerning which cell phone tower Defendant's phone, the victim's phone, and Jamicah Moore's phone were connected to at a particular time, as reflected in the cell phone records obtained, was lay testimony as in *Hayes*. Defendant is not entitled to relief on this issue.

## IV. Affidavits in Support of the Search Warrants

A trial court's factual findings on a motion to suppress are conclusive on appeal unless the evidence preponderates against them. *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996). Furthermore, questions about the "credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters

entrusted to the trial judge as the trier of fact." *Id.* "We afford to the party prevailing in the trial court the strongest legitimate view of the evidence and all reasonable and legitimate inferences that may be drawn from that evidence." *State v. Keith*, 978 S.W.2d 861, 864 (Tenn. 1998). However, we review a trial court's application of the law to the facts under a de novo standard of review. *State v. Williams*, 185 S.W.3d 311, 315 (Tenn. 2006).

### A.     *Basis of Knowledge and Credibility of Informants*

Defendant argues that the State failed to meet the two prongs of the *Aguillar-Spinelli* test setting forth the basis of knowledge and credibility of informants Dwight Turner and Angel Kilgore in the affidavits supporting the search warrants in this case. *State v. Jacumin,* 778 S.W.2d 430, 431 (Tenn. 1989); *Aguillar v. Texas,* 378 U.S. 104, 84 S.Ct. 1509 (1964); *Spinelli v. United States,* 393 U.S. 410, 89 S.Ct. 584 (1969).

An affidavit establishing probable cause is an indispensable prerequisite to the issuance of a search warrant. *See, e.g.*, Tenn. Code Ann. § 40-60-103; Tenn. R. Crim. P. 41(c); *State v. Henning*, 975 S.W.2d 290, 294 (Tenn. 1998); *State v. Moon*, 841 S.W.2d 336, 338 (Tenn. Crim. App. 1992). Such probable cause "must appear in the affidavit [itself] and judicial review of the existence of probable cause will not include looking to other evidence provided to or known by the issuing magistrate or possessed by the affiant." *Moon*, 841 S.W.2d at 338; *see also Henning*, 975 S.W.2d at 295. To sufficiently make a showing of probable cause, an affidavit "must set forth facts from which a reasonable conclusion might be drawn that the evidence is in the place to be searched." *State v. Smith*, 868 S.W.2d 561, 572 (Tenn. 1993). However, a decision regarding the existence of probable cause requires that the affidavit contain "more than mere conclusory allegations by the affiant." *State v. Stevens*, 989 S.W.2d 290, 293 (Tenn. 1999); *see also Moon*, 841 S.W.2d at 338.

"[B]efore a finding of probable cause may be based on an informant's tip, the basis of the informant's knowledge and the informant's credibility must also be established." *State v. Bridges*, 963 S.W.2d 487, 490 (Tenn. 1997)(citing *State v. Jacumin*, 778 S.W.2d 430, 432-36 (Tenn. 1989)). Tennessee law recognizes a distinction between those who are "citizen informants, or bystander witnesses, and criminal informants, or those from the criminal milieu." *State v. Cauley*, 863 S.W.2d 411, 417 (Tenn. 1993)(internal citations and quotations omitted). A person from the criminal milieu is one who is "intimately involved with the persons informed upon and with the illegal conduct at hand." *State v. Melson*, 638 S.W.2d 342, 354 (Tenn. 1982)(internal citations and quotations omitted). Information given by criminal informants "is not given in the spirit of a concerned citizen, but often is given in exchange for some concession, payment, or simply out of revenge against the subject." *State v. Stevens*, 989 S.W.290,

294 (Tenn. 1999)(internal citations and quotations omitted). In contrast, citizen informants are either "victims of the crime or have otherwise seen some portion of it." *Melson*, 638 S.W.2d at 354 (internal citations and quotations omitted). Information provided by known citizen informants is "presumed to be reliable," while information provided by criminal informants does not carry any presumptions of reliability and must be tested. *Stevens*, 989 S.W.2d at 293.

Case law warns against a hyper-technical application of the *Aguilar-Spinelli* test, and this court has previously provided that "[t]he requisite volume or detail of information needed to establish the informant's credibility is not particularly great." *State v. Lowe*, 949 S.W.2d 300, 305 (Tenn. Crim. App. 1996). However, precedent also provides that "the affiant must provide some concrete reason why the magistrate should believe the informant." *Id.*

Concerning Mr. Turner and Ms. Kilgore, the trial court found:

> As for the other informants, even assuming arguendo that they do not qualify as citizen informants, the Court finds that the affidavit names them and contains sufficient information to establish their basis of knowledge and veracity. Both Mr. Turner and Ms. Kilgore were present when the robbery was discussed and were in agreement that the defendant and Mssrs. Wood and Turner discussed it and Mr. Turner eventually refused to participate. Mr. Turner's description of the defendant's weapon and the account of the defendant's call were consistent with the physical evidence at the scene and the manner of the victim's death. The Court therefore finds no ground for suppression in this respect.

In his affidavit in support of the search warrant in this case, Detective Sowder averred as follows:

> I, David Sowder, do hereby make oath as follows:
>
> 1. I am a Hamilton County, Tennessee Deputy Sheriff.
>
> 2. The crimes being investigated are attempted robbery and murder in Hamilton County, Tennessee.
>
> 3. On 7-21-10, Darrian Moore was murdered at his home in Hamilton County. He was shot once in the head while sitting in his car. A

- 28 -

.380 caliber shell casing was found at the scene, which information had not been released.

4. According to Charles Moore, the victim's father, the victim returned home about 9:30 PM that night. The victim called his mother on the telephone at about 9:41, and was found, already shot, by his father at about 10:00 PM. According to this citizen informant, the victim was friendly with Frank Wood, a neighbor, and was often visited by Wood after getting off work in the evening.

5. I have spoken with Dwight Turner. According to Turner, he is friendly with Wood and Dominique Greer. Wood says that on 7-20, the three of them discussed robbing Moore. Wood suggested the crime, saying that the victim carried a First Tennessee Bank Card and that he could be forced at gunpoint to withdraw $3000 from a teller machine at night. He provided details of the victim's schedule.

6. Greer was to do the actual robbery, since he was unknown to the victim. Greer said that he had bought a .380 pistol.

7. Tuner said that although he intended to help in the robbery at first, he decided not to and refused.

8. Turner said that two nights later, Greer called him. He said that he and Wood had gone to put the plan into action, Greer having gotten black clothing to wear. Greer told Turner that the victim had struggled, and that the gun was fired at that time.

9. I have also spoken with another informant, Angel Kilgore. She told me that she was present when Woods, Greer, and Turner discussed the robbery, and that Turner refused to participate.

10. Greer, Wood, Turner, and Kilgore are all juveniles.

11. Wood lives at 4865 Long Hill Road, Chattanooga, Tn.

12. Greer lives with his mother at 4916 North Wind Dr., Chattanooga, Tn. He also stays often with his grandmother at 4715 Bonny Oaks Dr., Apt. 608, Chattanooga, Tn. His grandmother has told me that he was at that address at the time of the murder. I believe there is probable cause to believe that these locations may contain the .380

pistol, ammunition for it, and/or the black clothing worn by Greer. Based upon the foregoing information, I hereby request a warrant for the search thereof, for the items described above.

As pointed out by the State, the trial court did not specifically find that Mr. Turner and Ms. Kilgore were from the "criminal milieu." It appears from the evidence presented at the suppression hearing that Mr. Turner was not an ordinary citizen who "report[ed] a crime which [was] committed in [his] presence," nor that he acted with intent to "aid the police in law enforcement because of [his] concern for society or for [his] own [physical] safety." *State v. Stevens*, 989 S.W.2d 290, 294 (Tenn. 1999)(citing *State v. Smith*, 867 S.W.2d 343, 347 (Tenn. Crim. App. 1993)). Therefore, "it is proper to demand that some evidence of [his] reliability and credibility be shown" in accordance with *Aquilar-Spinelli*, *Id*. We note that there is nothing in the testimony of Detective Sowder, Ms. Kilgore, or in the affidavit which shows that Ms. Kilgore is in the "criminal milieu." We find her to be a "citizen informant."

The trial court correctly held that that the affidavit by Detective Sowder contained the basis for the knowledge and the veracity of Mr. Turner. The affidavit established that Mr. Turner was present when Mr. Wood and Defendant discussed robbing the victim. The trial court found that Mr. Turner's veracity was established when his description of Defendant's weapon matched the weapon used to murder the victim. Also, in the affidavit Detective Sowder affirmed that a .380 caliber shell casing was found at the murder scene, and that information had not been released at the time. Mr. Turner told Detective Sowder that, prior to the robbery, Defendant told him that he had purchased a .380 caliber pistol. Mr. Turner's veracity was further confirmed when he said that he received a call from Defendant who told him that the victim struggled and was shot. Officer Sowder affirmed that the victim was shot in the head.

As for Ms. Kilgore, she said that she was present when Defendant, Mr. Wood, and Mr. Turner discussed the robbery. She and Mr. Turner both made the statement that Mr. Turner refused to participate in the robbery.

Following our review of the record, we conclude that the affidavit in this case contained Mr. Turner's basis of knowledge and his veracity. Because we find Ms. Kilgore to be a "citizen-informant" her information carries a presumption of reliability. *State v. Bishop*, 431 S.W.3d 22, 38 (Tenn. 2014).

> B.     *Whether the Affidavits Provided Probable Cause that Evidence Would be Found in Defendant's Mother's House*

Next, Defendant asserts that the search warrant and affidavit failed to establish probable cause that evidence would be found at the home of Defendant's mother because the affidavit contained only a conclusory statement that Defendant lived there.

Under both the Tennessee and United States Constitutions, no search warrant may be issued except upon probable cause, which "requires reasonable grounds for suspicion, supported by circumstances indicative of an illegal act." *State v. Smotherman*, 201 S.W.3d 657, 662 (Tenn. 2006). Tennessee requires a written and sworn affidavit, "containing allegations from which the magistrate can determine whether probable cause exists," as "an indispensable prerequisite to the issuance of a search warrant." *State v. Henning*, 975 S.W.2d 290, 294 (Tenn. 1998). The affidavit must contain more than mere conclusory allegations on the part of the affiant. *Id*. The standard to be employed in reviewing the issuance of a search warrant is "whether the issuing magistrate had 'a substantial basis for concluding that a search would uncover evidence of wrongdoing.'" *Smotherman*, 201 S.W.3d at 662 (quoting *State v. Ballard*, 836 S.W.2d 560, 562 (Tenn. 1992)).

Our supreme court has explained that, in order to establish probable cause for the issuance of a search warrant, the underlying affidavit "must set forth facts from which a reasonable conclusion might be drawn that the evidence is in the place to be searched." *State v. Smith*, 868 S.W.2d 561, 572 (Tenn. 1993) (citations omitted). "The nexus between the place to be searched and the items to be seized may be established by the type of crime, the nature of the items, and the normal inferences where a criminal would hide the evidence." *Id*. (citation omitted); *see also State v. Saine*, 297 S.W.3d 199, 206 (Tenn. 2009) (recognizing that an affidavit in support of a search warrant "must show a nexus among the criminal activity, the place to be searched, and the items to be seized") (citing *State v. Reid*, 91 S.W.3d 247, 273 (Tenn. 2002); *Smith*, 868 S.W.2d at 572)). "In determining whether probable cause supports the issuance of a search warrant, reviewing courts may consider only the affidavit and may not consider other evidence provided to or known by the issuing magistrate or possessed by the affiant." *Id*. (citing *State v. Carter*, 160 S.W.3d 526, 533 (Tenn. 2005)).

Concerning this issue, the trial court held:

> The Court finally considers the issue of the conclusoriness of the information in the remaining affidavit regarding the addresses. The affidavits do not identify the sources of the addresses. The source of Mr. Wood's address, like Mr. Wood's address itself, is unnecessary to state probable cause for the issuance of search warrants for the defendant's and the defendant's grandmother's residences. Arguably, however, the source of the defendant's and defendant's grandmother's addresses is

- 31 -

necessary to state probable cause for the issuance of a search warrant for those residences.

\*          \*          \*

> Tennessee, of course, does not recognize the good-faith exception. *State v. Bearden*, 326 S,W,3d 184, 188(Tenn. Crim. App. 2010)(citing *State v. Carter*, 16 S.W.3d 762, 768 n.8 (Tenn. 2000), and *State v. Taylor*, 1987 Tenn. Crim. App. LEXIS 2763). In this case, however, the validity of the affidavits need not depend on the applicability of that exception. When an affiant does not attribute information to another source, it seems reasonable to presume that he himself or another officer is the presumptively reliable source of the information, unless there is evidence that the omission is material or misleading. In this case, there is no evidence that the omissions in the affidavits are material or misleading. Thus, it seems to the Court as reasonable to attribute the unattributed information about the defendant's and the defendant's grandmother's addresses to law-enforcement investigation of public records as it is to attribute the unattributed information about the physical evidence at the scene to law-enforcement investigation of the scene.

In his affidavit in support of the search warrant in this case, Detective Sowder averred as follows in relevant parts:

> 3. On 7-21-10, Darrian Moore was murdered at this home in Hamilton County. He was shot once in the head while sitting in his car. A .380 caliber shell casing was found at the scene, which information has not been released.

> \*          \*          \*

> 5. I have spoken with Dwight Turner. According to Turner, he is friendly with Wood and Dominique Greer. Wood says that on 7-20, the three of them discussed robbing Moore. Wood suggested the crime, saying that the victim carried a First Tennessee Bank Card and that he could be forced at gunpoint to withdraw $3000 from a teller machine at night. He provided details of the victim's schedule.

> 6. Greer was to do the actual robbery, since he was unknown to the victim. Greer said that he had bought a .380 pistol.

\* \* \*

8. Turner said that two nights later, Greer called him. He said that he and Wood had gone to put the plan into action, Greer having gotten black clothing to wear. Greer told Turner that the victim had struggled, and that the gun was fired at that time.

\* \* \*

12. Greer lives with his mother at 4916 North Wind Dr., Chattanooga, Tn. He also stays often with his grandmother at 4715 Bonny Oaks Dr., Apt. 608, Chattanooga, Tn. His grandmother has told me that he was at that address at the time of the murder. I believe that there is probably cause to believe that these locations may contain the .380 pistol, ammunition for it, and/or the black clothing worn by Greer.

Defendant relies on this court's decision in *State v. Nightwine*, No. M2013-00609-CCA-R3-CD, 2013 WL 6669393 (Tenn. Crim. App. Dec. 17, 2013) for his argument that the affidavit was insufficient to provide a nexus that he lived at the residence on North Wind Drive with his mother. *Nightwine* involved drug sales to an undercover confidential informant. In the affidavit supporting the search warrant, there was a statement that the defendant had moved from 823 Stafford Street to 115 Emory Street. *Id.* at \*1. The information contained in the affidavit also indicated that the informant had made two buys from the defendant at 823 Stafford Street and two buys from 115 Emory Street. *Id.* at \*1-2. The defendant argued that the affidavit did not provide information that the informant saw drugs inside the residence at 115 Emory Street. *Id.* at 2-3. The trial court held that the affidavit "fail[ed] to state that the confidential source made the purchases from inside the residence since it use[d] the language 'at Emory Street;'" and concluded that "no reasonable nexus exists to issue the [s]earch warrant to [s]earch inside of the residence." *Id.* at \*3. The State appealed the court's ruling and argued that the trial court erred in making a distinction between buys occurring "at" the residence as stated in the affidavit and "in" the residence. *Id.* at \*3. This court noted:

To begin our analysis, we note that the affidavit does not state, as the State suggests, that the sales took place *at Mr. Nightwine's residence* located at 115 Emory Street. Rather, the affidavit asserts only that the sales took place "at 115 Emory Street" without any further specificity as to the location of the sales or reference to the residence.

*Id.* at \*6. The court looked at *State v. Saine*, 297 S.W.3d 199, 206 (Tenn. 2009), another case concerning drug buys, and found that the affidavit in *Nightwine* did not contain the

additional facts that were present in *Saine* that supported an inference that drugs would be found *in Saine's* residence. In *Nightwine*, this Court held:

> Beyond a physical street address, the affidavit is completely devoid of any specificity as to the location of the controlled buys or their relation to the residence located at 115 Emory Street. The only connection to the residence set out in the affidavit is a conclusory assertion that Mr. Nightwine resides at that location; however, the affidavit fails to explain the basis of this conclusion or provide any further connection to the residence.

The present case involves a murder and evidence related to the murder. The affidavit sets out that that Defendant had been involved in a plan to rob the victim. The victim was shot while sitting in his car and Defendant had purchased a .380 caliber weapon to use in the robbery. Defendant had obtained black clothing to wear during the robbery, and Defendant told Mr. Turner that the "victim struggled, and that the gun was fired at that time." The affidavit further states: "I believe that there is probable cause to believe that these locations may contain the .380 pistol, ammunition for it, and/or the black clothing worn by Greer." It is logical to assume that the weapon used and clothing worn during the murder and attempted robbery would be located at Defendant's residence. The affidavit lists that Defendant is a juvenile, therefore, it is also logical to assume that he lives with his mother. The affidavit also reflects that Defendant often stays with his grandmother on Bonny Oaks Drive and that he was at her residence at the time of the murder.

We find that the affidavit establishes a sufficient nexus between the criminal activity and the place to be searched, namely Defendant's mother's house. Accordingly, we conclude that the trial court did not err by denying his motion to suppress. Defendant is not entitled to relief on this issue.

## V.      Constructive Amendment to the Indictment

Defendant contends that there was a constructive amendment to the indictment charging him with first degree felony murder because the indictment provided that Defendant committed the felony murder "during the perpetration of a robbery," and the State's theory at trial was that the murder was committed during the perpetration of an attempted especially aggravated robbery.

Motions alleging defects in the indictment "must be raised before trial" or the claim is subject to waiver; however, a party may raise a claim that the indictment "fails to charge an offense" at any time. Tenn. R. Crim. P. 12(b)(2)(B). The overriding principle

- 34 -

governing indictments is that the accused is constitutionally guaranteed the right to be informed of the nature and cause of the accusation. U.S. Const. amend. 6, 14; Tenn. Const. art. I, § 9; *see Wyatt v. State*, 24 S.W.3d 319, 324 (Tenn. 2000). Our courts have interpreted this constitutional mandate to require an indictment to "1) provide notice to the accused of the offense charged; 2) provide the court with an adequate ground upon which a proper judgment may be entered; and 3) provide the defendant with protection against double jeopardy." *Wyatt*, 24 S.W.3d at 324 (citations omitted). Further, an indictment is statutorily required to "state the facts constituting the offense in ordinary and concise language, without prolixity or repetition, in such a manner so as to enable a person of common understanding to know what is intended and with that degree of certainty which will enable the court, on conviction, to pronounce the proper judgment." Tenn. Code Ann. § 40-13-202. The question of the validity of an indictment is one of law and, as such, or review is de novo. *State v. Hill*, 954 S.W.2d 725, 727 (Tenn. 1997).

"A variance between an indictment or a subsequent bill of particulars and the evidence presented at trial is not fatal unless it is both material and prejudicial." *State v. Shropshire*, 45 S.W.3d 64, 71 (Tenn. Crim. App. 2000)(citing *State v. Moss*, 662 S.W.2d 590, 592 (Tenn. 1984)). "A variance between an indictment and the proof in a criminal case is not material where the allegations of proof substantially correspond, the variance is not of a character which could have misled the defendant at trial[,] and is not such as to deprive the accused of the right to be protected against another prosecution for the same offense." *Moss*, 662 S.W.2d at 592. It is not reversible error when a defendant is sufficiently aware of the charge and is able to adequately prepare for trial. *Id*. Contrary to the Defendant's assertion, we conclude that the indictment described a crime under Tennessee law in that it referenced the appropriate statute for first degree felony murder and provided Defendant with sufficient notice to prepare for trial.

Defendant cites *State v. Goodson* in support of his contention that his conviction should be reversed because the proof at trial did not correspond to the indictment on which Defendant was convicted. 77 S.W.3d 240, 244 (Tenn. Crim. App. 2001). However, the *Goodson* decision does not apply to the facts in Defendant's case. In *Goodson*, the defendant was indicted for driving on a revoked license; however, the evidence at trial "established the separate offense of driving on a suspended license." *Id*. at 241-42. This court held that "[t]he proof introduced at trial regarding the [defendant's] suspended driving status constituted a constructive amendment of the indictment by broadening the grounds for conviction." *Id*. at 245. In contrast, we believe that the proof at Defendant's trial corresponded to the indicted offense of felony murder in the perpetration of a robbery. As charged in this case, first degree felony murder is "[a] killing of another committed **in the perpetration of or attempt to perpetrate any** . . . robbery[.]" Tenn. Code Ann. § 39-13-202(a)(2)(*emphasis added*).

The indictment was sufficient in this case to notify Defendant that he was charged with felony murder in the perpetration of or attempt to perpetrate any robbery. *State v. Hammonds*, 30 S.W.3d 294, 300 (Tenn. 2000)(holding that an indictment that provides "notice to the accused will be considered sufficient to satisfy both constitutional and statutory requirements"). The indictment and the proof substantially corresponded and the indictment, which referenced the first degree murder statute, provided Defendant with sufficient notice and protection against double jeopardy. Moreover, Defendant was also indicted in a separate count for attempted especially aggravated robbery. Therefore, he was on notice that he would have to defendant against that charge. Defendant has not alleged nor demonstrated that he was prejudiced in any way by the indictment. The record does not show that the State attempted to rely on any theories that were not fairly embraced in the allegations made in the indictment. *State v. Mayes*, 854 S.W.2d 638, 640 (Tenn. 1993)(citations omitted). Also, Defendant was not convicted of a ground not included in the indictment. *Goodson*, 77 S.W.3d at 244. Defendant is not entitled to relief on this issue.

## VI.    Sufficiency of the Evidence

Defendant contends that the evidence at trial was insufficient to support his conviction for first degree felony murder. Specifically, Defendant asserts that the evidence failed to show that a robbery occurred and that the "major testimony" came from two accomplices. The State responds that the evidence was sufficient to sustain Defendant's convictions.

The standard for appellate review of a claim challenging the sufficiency of the State's evidence is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see* Tenn. R. App. P. 13(e); *State v. Davis*, 354 S.W.3d 718, 729 (Tenn. 2011). To obtain relief on a claim of insufficient evidence, appellant must demonstrate that no reasonable trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *See Jackson*, 443 U.S. at 319. This standard of review is identical whether the conviction is predicated on direct or circumstantial evidence, or a combination of both. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011).

On appellate review, "'we afford the prosecution the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences which may be drawn therefrom.'" *Davis*, 354 S.W.3d at 729 (quoting *State v. Majors*, 318 S.W.3d 850, 857 (Tenn. 2010)); *State v. Williams*, 657 S.W.2d 405, 410 (Tenn. 1983); *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). In a jury trial, questions involving the credibility of witnesses and the weight and value to be given the evidence, as well as all factual

disputes raised by the evidence, are resolved by the jury as trier of fact. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *State v. Pruett*, 788 S.W.2d 559, 561 (Tenn. 1990). This court presumes that the jury has afforded the State all reasonable inferences from the evidence and resolved all conflicts in the testimony in favor of the State; as such, we will not substitute our own inferences drawn from the evidence for those drawn by the jury, nor will we re-weigh or re-evaluate the evidence. *Dorantes*, 331 S.W.3d at 379; *Cabbage*, 571 S.W.2d at 835; *see State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984). Because a jury conviction removes the presumption of innocence that appellant enjoyed at trial and replaces it with one of guilt at the appellate level, the burden of proof shifts from the State to the convicted appellant, who must demonstrate to this court that the evidence is insufficient to support the jury's findings. *Davis*, 354 S.W.3d at 729 (citing *State v. Sisk*, 343 S.W.3d 60, 65 (Tenn. 2011)).

It is well settled "that a conviction may not be based solely upon the uncorroborated testimony of an accomplice to the offense." *State v. Bane*, 57 S.W.3d 411, 419 (Tenn. 2001) (citing *State v. Stout*, 33 S.W.3d 531 (Tenn. 2001); *State v. Bigbee*, 885 S.W.2d 797, 803 (Tenn. 1994); *Monts v. State*, 379 S.W.2d 34, 43 (Tenn. 1964)). By way of explanation, our supreme court has stated:

> There must be some fact testified to, entirely independent of the accomplice's testimony, which, taken by itself, leads to the inference, not only that a crime has been committed, but also that the defendant is implicated in it; and this independent corroborative testimony must also include some fact establishing the defendant's identity. This corroborative evidence may be direct or entirely circumstantial, and it need not be adequate, in and of itself, to support a conviction; it is sufficient to meet the requirements of the rule if it fairly and legitimately tends to connect the defendant with the commission of the crime charged. It is not necessary that the corroboration extend to every part of the accomplice's evidence.

*Bane*, 57 S.W.3d at 419 (quoting *Bigbee*, 885 S.W.2d at 803); *see also State v. Fowler*, 373 S.W.2d 460, 463 (Tenn. 1963).

As charged in this case, first degree felony murder is "[a] killing of another committed in the perpetration of or attempt to perpetrate any . . . robbery[.]" Tenn. Code Ann. § 39-13-202(a)(2). "Robbery is the intentional or knowing theft of property from the person of another by violence or putting the person in fear." Tenn. Code Ann. § 39-13-401(a).

> "Knowing" means that a person acted knowingly with respect to the conduct or to circumstances surrounding the conduct when the person is aware of the nature of the conduct or that the circumstances exist. A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result.

Tenn. Code Ann. § 39-11-106(a)(20). "Intentional" is defined above. To convict for especially aggravated robbery, the State has to prove that the defendant robbed the victim with a deadly weapon and the victim suffered serious bodily injury. *Id.* § 39-13-403(a). A person commits criminal attempt when he or she acts with intent to complete a course of action that would constitute the offense, and the conduct constitutes a substantial step toward the commission of the offense. Tenn. Code Ann. § 39-12-101(a)(3).

Viewing all reasonable inferences in favor of the State, the evidence showed that Defendant murdered the victim during an attempted especially aggravated robbery. Dwight Turner testified that he, Defendant, and Franklin Wood had discussed robbing the victim because they knew that the victim worked and that he had been saving some money. Also, the victim and Mr. Wood had been friends, but they had a disagreement that ended their friendship. The plan was to hold the victim at gunpoint while he was parked in the driveway. They planned to place a covering over the victim's head and drive him to the bank and "get him to tell the code to the ATM to withdraw the money out of the bank." After the robbery, the plan was to drop Defendant off and drive the victim's car to a "chop shop" in Atlanta.

A second conversation about the robbery took place between Mr. Turner and Mr. Wood at Eric King's house on the night of the murder. This conversation was corroborated by Angel Kilgore, who was also present during the conversation, and Edward King who heard a portion of the conversation. Ms. Kilgore verified that Mr. Turner was afraid that Mr. Wood would "snitch" on them if the robbery occurred, and Mr. Turner eventually said that he did not want to participate in robbing the victim. She also said that Mr. Turner and Mr. Wood did not plan to kill the victim, but planned to hit him with the gun and scare him. She also said that they intended to buy school clothes with the money from the robbery and that they were going to dress all in black for the robbery. Sometime after the conversation between Mr. Wood and Mr. Turner, Defendant arrived at Mr. King's residence. Mr. Turner testified that Defendant wanted to rob the victim that night. Mr. Turner testified that Mr. Wood refused to go with Defendant to commit the robbery because he had to be home due to his curfew. Mr. Turner testified that he told Defendant that he was too intoxicated to go with him. Defendant then left. This information was also corroborated by Ms. Kilgore. Mr. Turner testified that Defendant later called him and said that he thought he had murdered the victim. Defendant told him that the victim began "tussling" with him and the gun "went off." The following day, Mr. Turner testified that he saw Defendant riding his bicycle.

- 38 -

Defendant again said that he thought he had murdered the victim. Mr. Turner further testified: "And he proceeded to say that, you know, he didn't trust nobody no more. He was like anybody who say something, brother, I got somebody who will take them off the map. Which was saying that he would kill them. No witnesses, nothing."

Franklin Wood testified that there was a conversation prior to the victim's murder about stealing guns from the victim. He claimed that the conversation took place more than a year prior to the murder. Mr. Wood also testified that just prior to the murder he was at a gathering at Edward King's house that included Mr. Turner and Ms. Kilgore. He also testified that Mr. Turner indicated that he was afraid that Mr. Wood would "snitch" about robbing the victim because Mr. Wood and the victim had been friends. Mr. Wood also testified that Defendant arrived at Mr. King's house later that night. Mr. Wood testified that he did not get into the car with Defendant because he had to be home in time for curfew. He said that Mr. Turner began crying and said that he did not want to get into trouble. Defendant then left.

Mr. Wood testified that on the day of the murder, Defendant had texted him and said that he needed some shoes and a shirt. Defendant also said that he had robbed someone on "58." He later met Defendant at the bottom of the hill near Mr. Wood's house. Defendant said that he had robbed a "white guy on 58 at the liquor store." Defendant flashed money that he had taken from the man, and Defendant also had a gun. Mr. Wood noted that Defendant was barefoot, and he was wearing a black t-shirt with a superman emblem. Mr. Wood testified that he and Defendant walked to the corner of the street where the victim lived, and Defendant asked, "[Where your boy at[?]" They both looked toward the victim's house and saw that the victim was not at home. Mr. Wood testified that he left Defendant standing in his next door neighbor's yard, and he knew what Defendant planned to do because Defendant "had a gun and he robbed somebody before and I knew I guess when he was over there and he was going to do it." Mr. Wood testified that he later missed three calls from Defendant. He called Defendant back at approximately 10:00 p.m., and Defendant asked if police were there. Defendant also said, "[Y]ou ain't seen me, you ain't heard from me."

Mr. Wood testified that after he and Defendant were arrested and while they were in juvenile court, Defendant said that the victim was "bucking the whole time and he knew [the victim] knew who he was and [the victim] tried to go for the keys and his head hit the gun and it went off." During a recorded call, Mr. Wood told Mr. Turner that he told Defendant where the bank was at and that it was the one by the mall. Mr. Wood also told Mr. Turner that Defendant planned to "sit out there until [the victim] got off." Mr. Wood admitted that he knew Defendant was going to rob the victim when he left Defendant standing near the victim's house. Mr. Wood testified that he thought the gun Defendant had was a chrome semiautomatic.

Sabretta Linder testified that while Defendant was incarcerated, he asked her to look for a gun that he referred to as his "bitch." She thought that the gun was registered to Defendant's brother, Kevin Greer, and that it was a silver ".38" [sic] caliber weapon. Defendant told her that the gun was supposed to be wrapped in a dark-colored sock and was at his grandmother's house near a bottle in the bushes outside of the house. Although Ms. Linder and police looked for the weapon behind the house, they did not find it. However, police found Mr. Carroll's wallet behind the apartment complex, and they also found two black t-shirts. In her statement to Detective Hinton, Ms. Linder told him that Defendant was involved in the victim's murder and that Jamicah drove the car that he was riding in. During a recorded jail call, Defendant told Ms. Linder to tell Jamicah Moore that he needed to stay away from the police. Defendant also told her to tell Mr. Moore what to say if the police talked to him.

A search warrant was executed at Defendant's residence. Police recovered a black superman t-shirt, a fragment from a rubber glove with Defendant's DNA on the inside, a live .380 caliber round of ammunition, and black tennis shoes. There was also a handwritten note that appeared to be an attempt to create an alibi. There was a spent .380 shell casing recovered from the murder scene, and the bullet recovered from the victim's head was a .380 auto caliber bullet. There was testimony by Detective Merritt that Defendant's cell phone was connected the same cell phone tower as the victim's phone at the time of the murder. We also note that prior to the victim's murder, Defendant robbed Steve Carroll of his wallet and cell phone as he was leaving work. Defendant used a small silver gun that Mr. Carroll thought was an automatic. Mr. Carroll's cell phone was used two hours before the victim's murder to call Defendant's associate, Jamicah Moore. As noted earlier in this opinion, Mr. Carroll's wallet was found behind the apartment complex where Defendant's grandmother lived.

We note that Defendant did not specifically challenge the sufficiency of the evidence to support his separate conviction for attempted especially aggravated robbery. Arguably, he has therefore in effect conceded that crucial proof. However, it seems that Defendant has at least implicitly challenged the sufficiency of the evidence of attempted especially aggravated robbery. The evidence is certainly sufficient to support the conviction of attempted especially aggravated robbery. Also, from a review of all of the evidence, a rational jury could find Defendant guilty of first degree murder during an attempt to commit especially aggravated robbery. The jury obviously accredited the testimony of the State's witnesses, and any accomplice testimony was sufficiently corroborated. Defendant is not entitled to relief on this issue.

## VII. Cumulative Error

Defendant contends that the errors raised in his brief amount to cumulative error which entitle him to a new trial. However, because we have determined that Defendant is entitled to a new trial based on an erroneous jury instruction, this issue is moot.

_____
THOMAS T. WOODALL, PRESIDING JUDGE